Russell S. Thompson, IV (029098)
Thompson Consumer Law Group, PC
5235 E. Southern Ave., D106-618
Mesa, AZ 85206
602-388-8898
866-317-2674 facsimile
rthompson@consumerlawinfo.com
Attorney for Plaintiffs

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mary Birdoes and Jeff Bowlin, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>        vs.<br><br>Drizly LLC and The Drizly Group, Inc.,<br><br>Defendants. | Case No. _____<br><br>**CLASS ACTION COMPLAINT AND TRIAL BY JURY DEMAND** |

Plaintiffs Mary Birdoes and Jeff Bowlin (collectively "Plaintiffs"), individually and on behalf of all others similarly situated, assert the following claims against Defendants Drizly LLC and The Drizly Group, Inc. (collectively "Defendants" or "Drizly"), based upon personal knowledge, public reporting, information and belief, and the investigation of counsel.

## NATURE OF ACTION

1.      Plaintiffs bring this Class Action Complaint on behalf of consumers who used the Drizly service and subsequently had their highly sensitive personal information exposed in a data breach. Drizly's failure to protect its customers' sensitive personal information allowed hackers to sell this information on the Dark Web – an underground

black market with rampant illegal activity. The Data Breach occurred sometime prior to February 13, 2020, yet Drizly did not alert its customers that their information was exposed until July 28, 2020, stating "that an unauthorized party appears to have obtained some of our customers' personal information" (the "Data Breach").

2.      Drizly is an online alcohol delivery service. As part of that service, Drizly collects highly sensitive customer information such as delivery addresses, billing addresses, dates of birth, email addresses, passwords, phone numbers, IP addresses, geolocation data, and credit card information. While Drizly acknowledged that some of this information such as email and delivery addresses was breached, startup and technology news site www.TechCrunch.com ("TechCrunch") reported that nearly all of this information was available for approximately 2.5 million Drizly accounts.[1]

3.      TechCrunch was able to obtain a portion of the Data Breach information and was able to verify the data against public records. The portion of the data that TechCrunch obtained contained highly sensitive customer information. TechCrunch identified the source of the data as a February 13, 2020 Dark Web post. That Dark Web listing additionally contains Drizly users' credit card numbers and order histories, placing customers at high risk for fraud, identity theft, and other financial crimes.

4.      Drizly not only failed to protect its customers highly sensitive information, it also failed to discover and disclose the full scope of the Data Breach. Drizly failed to disclose the Data Breach for over five months – from February 13, 2020 to July 28, 2020.

---

[1] Zack Whittaker, *Alcohol Delivery Service Drizly Confirms Data Breach*, TechCrunch (July 28, 2020), https://techcrunch.com/2020/07/28/drizly-data-breach/.

Class Action Complaint - 2

Drizly failed to maintain reasonable security measures, and as a result, Plaintiffs and Class Members were not afforded adequate notice that their customer information was compromised for five months and were unable to take proactive measures to mitigate the harm caused by the Data Breach.

5.     Plaintiffs' and Class Members' sensitive customer information is still available for purchase by cyber criminals on the Dark Web and may circulate for years in illicit forums. Therefore, Plaintiffs and Class Members have sustained an immediate, tangible injury as a direct result of the Data Breach. Plaintiffs and Class Members extended time and effort in reviewing bank and credit card statements in order to mitigate the effects of the Data Breach.

6.     Plaintiffs seek to remedy the harms caused by Drizly on behalf of themselves and all similarly situated individuals who sensitive customer data was stolen in the Data Breach. Plaintiffs and Class Members seek reimbursement of losses due to fraud, identity theft, and other financial losses, compensation for time spent in response to the Data Breach, credit monitoring and identity theft insurance, and injunctive relief requiring Drizly to improve its data security practices.

**JURISDICTION AND VENUE**

7.     This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d) because this is a class action involving more than 100 class members, the amount in controversy exceeds $5 million, and members of the class are citizens of states different from Drizly.

Class Action Complaint - 3

8.      This Court has personal jurisdiction over Drizly because (1) the defendant purposefully avails himself of the privilege of conducting business in Arizona and purposefully directs his activities toward Arizona; (2) the claim arises out of or relates to the defendant's contact with Arizona; and (3) the exercise of jurisdiction is reasonable.

9.      Venue is appropriate in this district under 28 U.S.C. §1391(b) and (c), because Defendants transact business within this district, and/or have an agent and/or can be found in this district, and the interstate trade and commerce, hereinafter described, is carried out, in substantial part, in this district.

## PARTIES

10.     Plaintiff Mary Birdoes natural person and a citizen of the state of Arizona and a resident of Scottsdale, Arizona.

11.     Plaintiff Birdoes used her credit and/or debit card to make purchases via the Drizly service. As a result of the Data Breach, Plaintiff Birdoes' highly sensitive consumer data was accessed by unauthorized third parties.

12.     Plaintiff Jeff Bowlin is a natural person and a citizen of the state of Arizona and a resident of Tucson, Arizona.

13.     Plaintiff Bowlin used his credit and/or debit card to attempt to make a purchase via the Drizly service. As a result of the Data Breach, Plaintiff Bowlin's highly sensitive consumer data was accessed by unauthorized third parties.

14.     Defendant Drizly, LLC is a limited liability company existing under the laws of the State of Delaware, with its principal place of business located at 334 Boylston Street, Suite 300, Boston, MA 02116.

Class Action Complaint - 4

15.     Defendant The Drizly Group, Inc. is a privately held Delaware corporation, organized and existing under the laws of the State of Delaware, with its principal place of business located at 334 Boylston Street, Suite 300, Boston, MA 02116.

## FACTUAL ALLEGATIONS

16.     According to their website, Drizly is the world's largest alcohol marketplace and the "best" way to shop for beer, wine and spirits. Drizly is one of the largest online alcohol delivery services in the U.S.

17.     Drizly is an online ordering application that partners with retail stores across North America to provide customers with the ability to purchase alcohol and have it delivered to them.

18.     On July 28, 2020, TechCrunch first reported that Drizly experienced a data breach, revealing far more information about the scope and extent of the Data Breach than Drizly provided to its customers.

19.     For example, according to Drizly's account of the Data Breach, the information acquired by hackers was limited to only customer email addresses, dates of birth, passwords, and delivery addresses.

20.     However, according to TechCrunch, as many as 2.5 million Drizly accounts are believed to have been stolen. TechCrunch was able to obtain a portion of the data, including several accounts of Drizly staff members, and verify the data against public records. The data obtained by TechCrunch revealed that the Data Breach also included user phone numbers, IP addresses and geolocation data associated with the user's billing address, despite Drizly's claims.

21.     It is important to note that Drizly has not yet indicated when the hack occurred, how long the Data Breach lasted and its users' sensitive customer data was exposed, when Drizly detected and became aware of the Data Breach, or how many accounts were affected. But, Drizly advised users to change their passwords.

22.     However, an anonymous spokesperson for Drizly stated to TechCrunch that: "In terms of scale, up to 2.5 million accounts have been affected. Delivery address was included in under 2% of the records. And as mentioned in our email to affected consumers, no financial information was compromised." Drizly's notification to its customers similarly stated, "it's important to note that no financial information -- i.e. neither credit card nor debit card information -- was compromised."

23.     Drizly's account of the Data Breach appears to be an intentional understatement of its scope and magnitude. For example, while Drizly claimed that no "financial information" was taken in the Data Breach, a screen capture (Figure 1) obtained by TechCrunch shows the exact opposite. Figure 1 below is a dark web posting from February 13, 2020 by a well-known seller of stolen credit card data. The listing offers to sell "Fresh Hacked drizly.com Account [sic] with Valid CC attached and Order History" for $14.

**Figure 1**



24.     The Drizly "Fresh Hacked" post in Figure 1 demonstrates that hackers successfully obtained Drizly users' sensitive customer data, including credit card numbers, resulting in the harm already sustained by Plaintiffs and Class members.

25.     Additionally, the "Fresh Hacked" post confirms that Plaintiffs and Class members are at an significant and imminent risk of future harm of identity theft and fraud, including fraudulent charges that may be placed on customers' cards, as cyber criminals on the dark web are able to purchase their financial information and use it to commit identity theft and fraud.

26.     Drizly failed to properly safeguard Plaintiffs' and Class members' information or timely notify them that sensitive customer data was stolen, allowing cybercriminals to access its users' sensitive customer data since at least February 13,

2020, when the "Fresh Hacked" dump of sensitive customer data was posted on the dark web. Drizly also failed to properly monitor its systems. Had it done so, it would have discovered the Data Breach much sooner.

27. Drizly had a continuing duty pursuant to statute, regulations, the common law, and industry standards to safeguard customers' sensitive customer data through reasonable and necessary data security measures and practices.

28. Drizly was—and at all relevant times has been—aware that the sensitive customer data that it obtains and processes is highly sensitive and could be used for nefarious purposes by third parties, such as perpetrating identity theft and making fraudulent purchases.

29. Drizly also was—and at all relevant times has been—aware of the importance of safeguarding its customers' sensitive customer data and of the foreseeable consequences that would occur if its data security systems were breached, including the fraud losses and theft that would be imposed on consumers.

30. Drizly's data security obligations were particularly important and well-known given the numerous recent malware-based payment card data breaches throughout the retail and food service industry preceding the Data Breach, including breaches at Neiman Marcus, Michaels, Sally Beauty Supply, P.F. Chang's China Bistro, Eddie Bauer, Goodwill, SuperValu Grocery, UPS, Home Depot, Jimmy John's, Dairy Queen Restaurants, Staples, Kmart, Noodles & Co., GameStop, Wendy's, Chipotle, Arby's, Wawa, and Rutter's, which have all been widely reported by the media over the last

several years. The increase in data breaches, and the risk of future breaches, is widely known throughout the retail and food service industry, including to Drizly.

31.     These warnings, among others, put Drizly on notice that it may be susceptible to a data breach and of the importance of prioritizing data security to prevent a breach. Despite Drizly's knowledge of the likelihood that its customers' payment sensitive customer data would be stolen without reasonable security measures, Drizly failed to implement adequate data security measures that would have prevented hackers from penetrating its systems to steal sensitive customer data.

**Drizly Violated Industry Standards**

32.     Drizly failed to comply with industry standards for data security and actively mishandled the data entrusted to it by its customers, including Plaintiffs and Class members.

33.     The Payment Card Industry Security Standards Council promulgates minimum standards, which apply to all organizations that store, process, or transmit sensitive customer data. These standards are known as the Payment Card Industry Data Security Standard ("PCI DSS"). PCI DSS is the industry standard governing the security of sensitive customer data, although it sets the minimum level of what must be done, not the maximum.

34.    PCI DSS version 3.2.1 (as described in Figure 2, below), released in May 2018 and in effect at the time of the Drizly Data Breach, imposes the following 12 "high-level" mandates:[2]

**Figure 2**



The PCI Data Security Standard

PCI DSS is the global data security standard adopted by the payment card brands for all entities that process, store or transmit cardholder data and/or sensitive authentication data. It consists of steps that mirror security best practices.

| Goals | PCI DSS Requirements |
|---|---|
| Build and Maintain a Secure Network and Systems | 1. Install and maintain a firewall configuration to protect cardholder data<br>2. Do not use vendor-supplied defaults for system passwords and other security parameters |
| Protect Cardholder Data | 3. Protect stored cardholder data<br>4. Encrypt transmission of cardholder data across open, public networks |
| Maintain a Vulnerability Management Program | 5. Protect all systems against malware and regularly update anti-virus software or programs<br>6. Develop and maintain secure systems and applications |
| Implement Strong Access Control Measures | 7. Restrict access to cardholder data by business need to know<br>8. Identify and authenticate access to system components<br>9. Restrict physical access to cardholder data |
| Regularly Monitor and Test Networks | 10. Track and monitor all access to network resources and cardholder data<br>11. Regularly test security systems and processes |
| Maintain an Information Security Policy | 12. Maintain a policy that addresses information security for all personnel |

This Guide provides supplemental information that does not replace or supersede PCI SSC Security Standards or their supporting documents.

35.    Furthermore, PCI DSS 3.2.1 sets forth detailed and comprehensive requirements to be followed to meet each of the 12 mandates.

36.    Among other things, PCI DSS 3.2.1 requires Drizly to: properly secure sensitive customer data; not store cardholder data beyond the time necessary to authorize

---

[2] See PCI SEC. STANDARDS COUNCIL, PCI DSS QUICK REFERENCE GUIDE: UNDERSTANDING THE PAYMENT CARD INDUSTRY DATA SECURITY STANDARD VERSION 3.2.1, at 11, (July 2018), https://www.pcisecuritystandards.org/documents/PCI_DSSQRG-v3_2_1.pdf.

a transaction; to timely upgrade its payment system software; implement proper network segmentation; encrypt sensitive customer data at the POS; restrict access to sensitive customer data to those with a need to know; establish a process to identify; and timely fix security vulnerabilities. Upon information and belief, Drizly failed to comply with some or all of these requirements.

37.     As noted in the chart, PCI DSS required Drizly to "protect all systems against malware." Drizly failed to do so. Drizly specified that it had "identified some suspicious activity involving customer data" and that "an unauthorized party appears to have obtained some of our customers' personal information…"

38.     PCI DSS also required Drizly to "[t]rack and monitor all access to network resources." Drizly failed to do so. The hacker(s) had access to Drizly's system for an unspecified period of time, illustrating that Drizly had materially deficient tracking and monitoring systems in place.

39.     Upon information and belief, Drizly violated numerous other provisions of the PCI DSS, including subsections underlying the chart above. Those deficiencies will be revealed during discovery with the assistance of expert witnesses.

40.     PCI DSS sets the minimum level of what must be done, not the maximum. While PCI compliance is an important first step in securing cardholder data, it is not sufficient on its own to protect against all breaches, nor does it provide a safe harbor against civil liability for a data breach.

41.     At all relevant times, Drizly was well-aware of its PCI DSS obligations to protect cardholder data. Drizly was an active participant in the payment card networks as

it collected and likely transmitted thousands (or more) of sets of payment card data per day across 180 geographic market across 26 states.

42.    Industry experts acknowledge that a data breach is indicative of data security failures. For example, research and advisory firm Aite Group has stated: "'If your data was stolen through a data breach that means you were somewhere out of compliance' with payment industry data security standards."[3]

**Drizly Violated the FTC Act**

43.    According to the Federal Trade Commission ("FTC"), the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data constitutes an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act of 1914 ("FTC Act"), 15 U.S.C. § 45.

44.    In 2007, the FTC published guidelines that establish reasonable data security practices for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies for installing vendor-approved patches to correct security problems. The guidelines also recommend that businesses consider using an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone may be trying to hack the

---

[3] Lisa Baertlein, *Chipotle Says Hackers Hit Most Restaurants in Data Breach*, REUTERS (May 26, 2017) (accessible at: https://www.reuters.com/article/us-chipotle-cyber/chipotle-says-hackers-hitmost-restaurants-in-data-breach-idUSKBN18M2BY) (last visited August 7, 2020).

system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

45.     The FTC also published a document entitled "FTC Facts for Business," which highlights the importance of having a data security plan, regularly assessing risks to computer systems, and implementing safeguards to control such risks.

46.     The FTC has issued orders against businesses that have failed to employ reasonable measures to secure sensitive customer data. These orders provide further guidance to businesses regarding their data security obligations.

47.     In the years leading up to the Data Breach, and during the course of the breach itself, Drizly failed to follow guidelines set forth by the FTC and actively mishandled the management of its IT security. Furthermore, by failing to have reasonable data security measures in place, Drizly engaged in an unfair act or practice within the meaning of Section 5 of the FTC Act.

**The Data Breach Damaged Plaintiffs and the Class.**

48.     As a result of Defendants' deficient security measures and failure to timely and adequately detect the Data Breach, Plaintiffs and Class Members have been harmed by the compromise of their sensitive customer data in the Data Breach.

49.     Plaintiffs and Class members also face a substantial and imminent risk of identity theft and fraudulent charges on credit and/or debit cards. Criminals carried out the Data Breach and stole the sensitive customer data with the intent to use it for fraudulent purposes and/or to sell it, as evidenced by the dark web posting listing Drizly users' sensitive customer data available for purchase.

50.     Furthermore, Plaintiffs and Class members will experience an increased likelihood of identity theft and fraud going forward. This is especially true as their email addresses, dates of birth, passwords, address, phone numbers, IP addresses were compromised, and their credit card numbers are currently available for purchase by criminals on the dark web.

51.     Also, many Class members will incur out of pocket costs for protective measures such as identity theft protection, credit monitoring fees, credit report fees, credit freeze fees, fees for replacement cards, and similar costs related to the Data Breach.

52.     Plaintiffs and Class members also suffered a "loss of value" of their credit and debit card information when it was stolen by the hacker in the Data Breach. A robust market exists for stolen card information, which is sold on the dark web at specific identifiable prices. This market serves as a means to determine the loss of value to Plaintiffs and Class members.

53.     Plaintiffs and Class members also suffered "benefit of the bargain" damages. Plaintiffs and Class members overpaid for goods that should have been—but were not—accompanied by adequate data security. Part of the price Plaintiffs and Class members paid to Drizly was intended to be used to fund adequate data security. Class members did not get what they paid for.

54.     Plaintiffs and Class members have spent and will continue to spend substantial amounts of time monitoring their payment card accounts for identity theft and fraud, disputing fraudulent transactions, and reviewing their financial affairs more closely than they otherwise would have done but for the Data Breach. Plaintiffs and Class

members will also spend time obtaining replacement cards and resetting automatic payment links to their new cards. These efforts are burdensome and time-consuming.

55.     Class members who experience actual identity theft and fraud will also be harmed by the inability to use their credit or debit cards when their accounts are suspended or otherwise rendered unusable due to the fraudulent charges. To the extent Class members are charged monthly/annual fees for their credit and/or debit accounts, they are left without the benefit of that bargain while they await receipt of their replacement cards. Class members will also be harmed by the loss of use of and access to their account funds and credit lines or being limited in the amount of money they are permitted to obtain from their accounts. Class members will further be harmed by the loss of rewards points or airline mileage available on credit cards that consumers lost credit for as a result of having to use alternative forms of payment while awaiting replacement cards. This includes missed payments on bills and loans, late charges and fees, and adverse effects on their credit, including decreased credit scores and adverse credit notations.

56.     A victim whose payment card information has been stolen or compromised may not see the full extent of identity theft or fraud until long after the initial breach. Additionally, a victim whose payment card information has been stolen may not become aware of charges when they are nominal, as typical fraud-prevention algorithms may not capture such charges. Those charges may be repeated, over and over again, on a victim's account.

57.     The risk of identity theft and fraud will persist for years. Identity thieves often hold stolen data for months or years before using it, to avoid detection. Also, the sale of stolen information on the dark web may take months or more to reach end-users, in part because the data is often sold in small batches as opposed to in bulk to a single buyer. Thus, Plaintiffs and Class members must vigilantly monitor their financial accounts forever.

58.     Identity thieves can combine data stolen in the Data Breach with other information about Plaintiffs and Class members gathered from underground sources, public sources, or even plaintiffs' and Class members' social media accounts. Thieves can use the combined data to send highly targeted phishing emails to Plaintiffs and Class members to obtain more sensitive information. Thieves can use the combined data to commit potential crimes including, e.g., opening new financial accounts in Plaintiffs and Class members' names, taking out loans in Plaintiffs and Class members' names, using Plaintiffs and Class members' information to obtain government benefits, filing fraudulent tax returns using Plaintiffs and Class members' information, obtaining driver's licenses in Plaintiffs and Class members' names but with another person's photograph, and giving false information to police during an arrest. Furthermore, the sensitive customer data stolen from Drizly can be used to drain debit card-linked bank accounts, make "clone" credit cards, or to buy items on certain less-secure websites.

59.     Drizly acknowledged that Plaintiffs and Class members face a significant risk of various types of identity theft stemming from the Data Breach. Shifting the burden of responding to the Data Breach to consumers, Drizly recommended that affected

customers undertake the following daunting tasks: "reset your Drizly password," "continue monitoring your account for any unusual activity," and "consider changing your passwords across any sites/apps that use the same password as your Drizly account."

60.     Thus, by virtue of that statement, Drizly acknowledges that Plaintiffs and Class members face an actual imminent risk of identity theft beyond just fraudulent credit and debit card transactions.

61.     Drizly has taken no affirmative steps—beyond notifying consumers of the Data Breach—to protect against these broad-based types of identity theft and fraud, such as offering free credit monitoring and identity theft insurance to all customers whose sensitive customer data was stolen in the Data Breach. Drizly's efforts are wholly insufficient to combat the indefinite and undeniable risk+ of identity theft and fraud

## CLASS ALLEGATIONS

62.     Plaintiffs bring this case as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2) and (b)(3) on behalf of a Nationwide Class.

> All persons in the United States whose sensitive consumer data was compromised in the Data Breach made Public by Drizly on July 28, 2020.

63.     Excluded from the Class is Drizly and its subsidiaries and affiliates; all employees of Drizly and its subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; government entities; and the judge to whom this case is assigned, including his/her immediate family and court staff.

64.     Plaintiffs reserve the right to modify, expand or amend the above Class definitions or to seek certification of a class or Classes defined differently than above before any court determines whether certification is appropriate following discovery.

65.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because all elements of Fed. R. Civ. P. 23(a) and (b)(2)-(3) are satisfied. Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in an individual action alleging the same claims.

66.     **Numerosity**: All requirements of Fed. R. Civ. P. 23(a)(1) are satisfied. The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. While Plaintiffs are informed and believes that there are millions of members of the Class, the precise number of Class members is unknown to Plaintiffs. These estimates are based on the fact that Drizly has admitted that "up to 2.5 million accounts have been affected." Class members may be identified through objective means. Class members may be notified of the pendency of this action by recognized, court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

67.     **Commonality and Predominance**: All requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) are satisfied. This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

      a.  Whether Drizly engaged in active misfeasance and misconduct alleged herein;

b.  Whether Drizly owed a duty to Class members to safeguard their sensitive customer data;

c.  Whether Drizly breached its duty to Class members to safeguard their sensitive customer data;

d.  Whether a computer hacker obtained class members' sensitive customer data in the Data Breach;

e.  Whether Drizly knew or should have known that its data security systems and monitoring processes were deficient;

f.  Whether Plaintiffs and Class members suffered legally cognizable damages as a result of the Data Breach;

g.  Whether Drizly's failure to provide adequate security proximately caused Plaintiffs' and class members' injuries; and

h.  Whether Plaintiffs and Class members are entitled to declaratory and injunctive relief.

68.    **Typicality**: All requirements of Fed. R. Civ. P. 23(a)(3) are satisfied. Plaintiffs are members of the Class. Plaintiffs' claims are typical of the claims of all Class members because Plaintiffs, like other Class members, suffered a theft of their sensitive customer data in the Data Breach.

69.    **Adequacy of Representation**: All requirements of Fed. R. Civ. P. 23(a)(4) are satisfied. Plaintiffs are adequate Class representatives because they are members of the class and their interests do not conflict with the interests of other class members that they seek to represent. Plaintiffs are committed to pursuing this matter for the class with the class's collective best interests in mind. Plaintiffs have retained counsel competent and experienced in complex class action litigation of this type and Plaintiffs intends to prosecute this action vigorously. Plaintiffs, and their counsel, will fairly and adequately protect the class's interests.

70. **Predominance and Superiority**: All requirements of Fed. R. Civ. P. 23(b)(3) are satisfied. As described above, common issues of law or fact predominate over individual issues. Resolution of those common issues in Plaintiffs' case will also resolve them for the class's claims. In addition, a class action is superior to any other available means for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Drizly, so it would be impracticable for members of the Class to individually seek redress for Drizly's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

71. **Cohesiveness**: All requirements of Fed. R. Civ. P. 23(b)(2) are satisfied. Drizly has acted, or refused to act, on grounds generally applicable to the Class such that final declaratory or injunctive relief appropriate.

# COUNT I
## NEGLIGENCE

72.     Plaintiffs re-alleges and incorporates by reference all preceding allegations as if fully set forth herein.

73.     Drizly obtained Plaintiffs' and Class members' sensitive customer data in connection with class members' purchases on Drizly.

74.     By collecting and maintaining sensitive customer data, Drizly had a duty of care to use reasonable means to secure and safeguard the sensitive customer data and to prevent disclosure of the information to unauthorized individuals. Drizly's duty included a responsibility to implement processes by which it could detect a data breach of this type and magnitude in a timely manner.

75.     Drizly owed a duty of care to Plaintiffs and Class members to provide data security consistent with the various requirements and rules discussed above.

76.     Drizly's duty of care arose as a result of, among other things, the special relationship that existed between Drizly and its customers. Drizly was the only party in a position to ensure that its systems were sufficient to protect against the foreseeable risk that a data breach could occur, which would result in substantial harm to consumers.

77.     Also, Drizly had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, failing to use reasonable measures to protect confidential consumer data.

78.     Drizly's duty to use reasonable care in protecting cardholder data arose as a result of the common law, statutes, and regulations described above, but also because Drizly is bound by industry standards and PCI DSS rules to protect sensitive customer data.

79.     Drizly was subject to an "independent duty" untethered to any contract between Plaintiffs and Class members and Drizly.

80.     Drizly breached its duties, and thus was negligent, by failing to use reasonable measures to protect cardholder information. Drizly's negligent acts and omissions include, but are not limited to, the following:

    a.  failure to delete cardholder information after the time period necessary to authorize the transaction;

    b.  failure lure to employ systems and educate employees to protect against malware;

    c.  failure to comply with industry standards for software and payment system security;

    d.  failure to track and monitor access to its network and cardholder data;

    e.  failure to limit access to those with a valid purpose;

    f.  failure to adequately staff and fund its data security operation;

    g.  failure to use due care in hiring, promoting, and supervising those responsible for its data security operations; and

    h.  failure to recognize that hackers were stealing sensitive customer data from its network while the Data Breach was taking place.

81.     It was foreseeable to Drizly that a failure to use reasonable measures to protect sensitive customer data could result in injury to consumers. Further, actual and attempted breaches of data security were reasonably foreseeable to Drizly given the

Class Action Complaint - 22

known frequency of payment card data breaches and various warnings from card brands and industry experts.

82.     Plaintiffs and Class members suffered various types of damages as alleged above.

83.     Drizly's wrongful conduct was a proximate cause of Plaintiffs' and Class members' damages.

84.     Plaintiffs and Class members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

85.     Plaintiffs and Class members are also entitled to injunctive relief requiring Drizly to (among other things): (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems; and (iii) provide several years of free credit monitoring and identity theft insurance to all Class members.

## COUNT II
## NEGLIGENCE *PER SE*

86.     Plaintiffs reallege and incorporate all previous allegations as though fully set forth herein.

87.     As alleged above, pursuant to the FTC Act, 15 U.S.C. § 45, Drizly had a duty to provide fair and adequate computer systems and data security practices to safeguard plaintiffs' and Class members' sensitive customer data.

88.     Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Drizly, of failing to use reasonable measures to protect sensitive

customer data. The FTC publications and orders described above also form part of the basis of Drizly's duty.

89.     Drizly violated Section 5 of the FTC Act by failing to use reasonable measures to protect sensitive customer data and not complying with applicable industry standards, including PCI DSS, as described in detail herein. Drizly's conduct was particularly unreasonable given the nature and amount of sensitive customer data it collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to consumers.

90.     Plaintiffs and members of the Class are within the class of persons that Section 5 of the FTC Act was intended to protect, because the FTC Act was expressly designed to protect consumers from "substantial injury."

91.     The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and Class members.

92.     Drizly had a duty to Plaintiffs and Class members to implement and maintain reasonable security procedures and practices to safeguard plaintiffs' and Class members' sensitive customer data.

93.     Drizly breached its duties to Plaintiffs and Class members under the FTC Act, by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard plaintiffs' and Class members' sensitive customer data.

94.     Drizly's violation of Section 5 of the FTC Act and its failure to comply with applicable laws and regulations constitutes negligence *per se*.

95.     But for Drizly's wrongful and negligent breach of its duties owed to Plaintiffs and class members, Plaintiffs and Class members would not have been injured.

96.     The injury and harm suffered by Plaintiffs and Class members was the reasonably foreseeable result of Drizly's breach of its duties. Drizly knew or should have known that it was failing to meet its duties and that its breach would cause Plaintiffs and Class members to suffer the foreseeable harms associated with the exposure of their sensitive customer data.

97.     Had Plaintiffs and Class members known that Drizly did and does not adequately protect customer sensitive customer data, they would not have made purchases on Drizly.

98.     As a direct and proximate result of Drizly's negligence *per se*, Plaintiffs and Class members have suffered harm, including but not limited to loss of time and money resolving fraudulent charges; loss of time and money obtaining protections against future identity theft; financial losses related to the purchases made at Drizly that Plaintiffs and Class members would not have made had they known of Drizly's careless approach to cyber security; lost control over the value of sensitive customer data; unreimbursed losses relating to fraudulent charges; losses relating to exceeding credit and debit card limits and balances; harm resulting from damaged credit scores and information; and other harm resulting from the unauthorized use or threat of

unauthorized use of stolen sensitive customer data, entitling them to damages in an amount to be proven at trial.

## COUNT III
## BREACH OF IMPLIED CONTRACT

99.    Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

100.    When Plaintiffs and Class members provided their sensitive customer data to Drizly in exchange for Drizly's products, they entered into implied contracts with Drizly under which Drizly agreed to take reasonable steps to protect the sensitive customer data.

101.    Drizly solicited and invited Plaintiffs and Class members to provide their sensitive customer data as part of Drizly's regular business practices. Plaintiffs and Class members accepted Drizly's offers and provided their sensitive customer data to Drizly.

102.    When entering into the implied contracts, Plaintiffs and Class members reasonably believed and expected that Drizly's data security practices complied with relevant laws, regulations, and industry standards.

103.    Plaintiffs and Class members paid money to Drizly to purchase items on Drizly.

104.    Plaintiffs and Class members reasonably believed and expected that Drizly would use part of those funds to obtain adequate data security. Drizly failed to do so.

105.   Plaintiffs and Class members would not have provided their sensitive customer data to Drizly in the absence of Drizly's implied promise to keep the sensitive customer data reasonably secure.

106.   Plaintiffs and Class members fully performed their obligations under the implied contracts by paying money to Drizly.

107.   Drizly breached its implied contracts with Plaintiffs and Class members by failing to implement reasonable data security measures.

108.   As a direct and proximate result of Drizly's breaches of the implied contracts, Plaintiffs and Class members sustained damages as alleged herein.

109.   Plaintiffs and Class members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

**COUNT IV**
**UNJUST ENRICHMENT**

110.   Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

111.   This claim is plead in the alternative to the above implied contract claim.

112.   Plaintiffs and Class members conferred a monetary benefit upon Drizly in the form of monies paid for the purchase of items on Drizly.

113.   Drizly appreciated or had knowledge of the benefits conferred upon it by Plaintiffs and Class members. Drizly also benefited from the receipt of Plaintiffs' and Class members' sensitive customer data as this was utilized by Drizly to facilitate payment to it.

114.   The monies Plaintiffs and Cass members paid to Drizly were supposed to be used by Drizly, in part, to pay for adequate data privacy infrastructure, practices, and procedures.

115.   As a result of Drizly's conduct, Plaintiffs and Class members suffered actual damages in an amount equal to the difference in value between their purchases made with adequate data privacy and security practices and procedures that Plaintiffs and Class members paid for, and those purchases without adequate data privacy and security practices and procedures that they received.

116.   Under principals of equity and good conscience, Drizly should not be permitted to retain the money belonging to Plaintiffs and Class members because Drizly failed to implement (or adequately implement) the data privacy and security practices and procedures that Plaintiffs and Class members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

117.   Drizly should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class members all unlawful or inequitable proceeds received by it as a result of the conduct and Data Breach alleged herein.

**COUNT V**
**ARIZONA CONSUMER FRAUD ACT**

118.   Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

119.   Drizly is a "person" as defined by A.R.S. § 44-1521(6).

Class Action Complaint - 28

120.   Drizly advertised, offered, or sold goods or services in Arizona and engaged in trade or commerce directly or indirectly affecting the people of Arizona.

121.   Drizly engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts affecting the people of Arizona in connection with the sale and advertisement of "merchandise" (as defined in Arizona Consumer Fraud Act, A.R.S. § 44-1521(5)) in violation of A.R.S. § 44-1522(A), including:

    a.   Failing to implement and maintain reasonable security and privacy measures to protect Plaintiffs and Arizona Class members' Personal Information, which was a direct and proximate cause of the Data Breach;

    b.   Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

    c.   Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs and Arizona Class members' Personal Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach;

    d.   Misrepresenting that it would protect the privacy and confidentiality of Plaintiffs and Arizona Class members' Personal Information, including by implementing and maintaining reasonable security measures;

    e.   Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs and Arizona Class members' Personal Information, including duties imposed by the FTC Act, 15 U.S.C. § 45;

    f.   Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiffs and Arizona Class members' Personal Information; and

    g.   Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security

and privacy of Plaintiffs and Arizona Class members' Personal Information, including duties imposed by the FTC Act, 15 U.S.C. § 45.

122.    Drizly's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Drizly's data security and ability to protect the confidentiality of consumers' Personal Information.

123.    Drizly intended to mislead Plaintiffs and Arizona Class members and induce them to rely on its misrepresentations and omissions.

124.    Had Drizly disclosed to Plaintiffs and class members that its data systems were not secure and, thus, vulnerable to attack, Drizly would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Instead, Drizly received, maintained, and compiled Plaintiffs' and class members' Personal Information as part of the services Drizly provided and for which Plaintiffs and class members paid without advising Plaintiffs and class members that Drizly's data security practices were insufficient to maintain the safety and confidentiality of Plaintiffs' and class members' Personal Information. Accordingly, Plaintiffs and the Arizona Class members acted reasonably in relying on Drizly's misrepresentations and omissions, the truth of which they could not have discovered.

125.    Drizly acted intentionally, knowingly, and maliciously to violate Arizona's Consumer Fraud Act, and recklessly disregarded Plaintiffs and Arizona Class members' rights. Drizly's past data breaches and breaches within the hospitality industry put it on notice that its security and privacy protections were inadequate.

126.    As a direct and proximate result of Drizly's unfair and deceptive acts and practices, Plaintiffs and class members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including loss of the benefit of their bargain with Drizly as they would not have paid Drizly for goods and services or would have paid less for such goods and services but for Drizly's violations alleged herein; losses from fraud and identity theft; costs for credit monitoring and identity protection services; time and expenses related to monitoring their financial accounts for fraudulent activity; time and money spent cancelling and replacing passports; loss of value of their Personal Information; and an increased, imminent risk of fraud and identity theft.

127.    Plaintiffs and Arizona Class members seek all monetary and non-monetary relief allowed by law, including compensatory damages; restitution; disgorgement; punitive damages; injunctive relief; and reasonable attorneys' fees and costs.

**RELIEF REQUESTED**

Plaintiffs, on behalf of all others similarly situated, request that the Court enter judgment against Drizly including the following:

A. Determining that this matter may proceed as a class action and certifying the Class asserted herein;

B. Appointing Plaintiffs as representatives of the Class and appointing Plaintiffs' counsel as class counsel;

C. An award to Plaintiffs and the Classes of compensatory, consequential, statutory, and treble damages as set forth above;

D. Ordering injunctive relief requiring Drizly to (among other things): (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems; and (iii) provide several years of free credit monitoring and identity theft insurance to all Class members;

E. An award of attorneys' fees, costs, and expenses, as provided by law or equity;

F. An award of pre-judgment and post-judgment interest, as provided by law or equity; and

G. Such other relief as the Court may allow.

## TRIAL BY JURY

128.    Plaintiffs are entitled to and hereby demand a trial by jury.

Dated: August 20, 2020.          Respectfully submitted,

s/ Russell S. Thompson, IV
Russell S. Thompson, IV (029098)
Thompson Consumer Law Group, PC
5235 E. Southern Ave., D106-618
Mesa, AZ 85206
602-388-8898
866-317-2674 facsimile
rthompson@consumerlawinfo.com
Attorneys for Plaintiffs

Class Action Complaint - 32